**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DJB HOLDING CORPORATION; TAX MATTERS PARTNER; WB PARTNERS, FKA WB Acquisition Partners, *Petitioners-Appellants*, <br><br> v. <br><br> COMMISSIONER OF INTERNAL REVENUE, *Respondent-Appellee*. | No. 12-70574 <br><br> Tax Ct. No. 29106-07 |

| | |
|---|---|
| WB ACQUISITION & SUBSIDIARY, *Petitioner-Appellant*, <br><br> v. <br><br> COMMISSIONER OF INTERNAL REVENUE, *Respondent-Appellee*. | No. 12-70575 <br><br> Tax Ct. No. 26187-06 |

WB ACQUISITION, INC.,
          *Petitioner-Appellant*,

v.

COMMISSIONER OF INTERNAL
REVENUE,
          *Respondent-Appellee*.

No. 12-70576

Tax Ct. No.
5039-08

OPINION

Appeal from a Decision of the
Tax Court

Argued and Submitted
December 9, 2014—San Francisco, California

Filed October 7, 2015

Before: Alex Kozinski, Johnnie B. Rawlinson,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Murguia

## SUMMARY[*]

### Tax

The panel affirmed three Tax Court decisions involving federal income tax deficiencies and accuracy-related penalties.

Greg Watkins and Daren Barone, owners of asbestos removal business Watkins Contracting, Inc. (WCI), structured WCI's sale and reacquisition via various holding corporations to limit their personal exposure. WCI and one of the holding corporations, WB Partners, then formed the NTC Joint Venture for an environmental remediation project.

The panel held that the Tax Court did not clearly err in finding no intent to operate the NTC Joint Venture as a bona fide partnership, and in taxing profits from the venture as income only to WCI.

As part of the sale of WCI assets to Kuranda Capital, LP, Watkins, Barone, and WCI agreed not to compete with Kuranda in the environmental remediation business. The panel held that Watkins's and Barone's non-competition agreement with Kuranda may not be imputed to WB Partners, and that the Tax Court did not clearly err in not assigning any portion of the proceeds of the noncompetition agreement to WB Partners.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Finally, the panel held that the Tax Court did not commit reversible error in assessing an accuracy-related penalty, because taxpayers identified no substantial authority or reasonable cause for their positions.

## COUNSEL

Lacey Strachan and Steven Toscher (argued), Hochman, Salkin, Rettig, Toscher & Perez, P.C., Beverly Hills, California, for Petitioners-Appellants.

Andrew Weiner (argued) and Teresa Ellen McLaughlin, Attorneys, and Gilbert Steven Rothenberg, Deputy Assistant Attorney General, United States Department of Justice, Washington, D.C.; William J. Wilkins, Chief Counsel, Internal Revenue Service, Washington D.C., for Respondent-Appellee.

## OPINION

MURGUIA, Circuit Judge:

Daren Barone and Gregory Watkins drew upon their experience in asbestos removal to establish a successful environmental remediation company, Watkins Contracting, Inc ("WCI"). With success came risk—in particular, the danger that Barone and Watkins would be held personally liable for the cost of completing any projects that WCI was unable to finish. To shield themselves from this risk, the two men restructured WCI so that several corporate entities stood between them and the company. Barone and Watkins each formed a holding corporation, and the two corporations

entered a partnership, Appellant WB Partners. Barone and Watkins also formed a third holding company, Appellant WB Acquisition, Inc., and transferred their interest in WCI to this company. Finally, WB Partners purchased all shares of WB Acquisition. As a result, WCI was owned by WB Acquisition, which was owned by WB Partners, which in turn was owned by Barone's and Watkins's holding corporations. This elaborate corporate structure provided Barone and Watkins with multiple levels of protection from personal liability. *See* Appendix.

An opportunity arose to do environmental remediation work for a massive redevelopment project at the San Diego Naval Training Center ("NTC"). To win the contract, however, WCI would have to post a large bond against the possibility that it would be unable to complete the work. To ensure that WCI could afford the bond, Barone and Watkins caused WCI and WB Partners to form a joint venture, dubbed the NTC Joint Venture. Under the terms of the joint venture agreement, WCI would do the environmental remediation work, and WB Partners would supply financial guaranties. In exchange for these services, WCI would receive thirty percent of the venture's profits, and WB Partners would receive seventy percent.

The joint venture's structure had significant federal income tax consequences. WCI would have to pay corporate income tax on its thirty-percent share of the venture's profits. As a general partnership, WB Partners would pay no income tax on its seventy-percent share; instead, that income would pass through to WB Partners' owners, the two holding corporations. The holding corporations were S corporations, whose income is treated in the same manner as that of a general partnership—it passes through to the S corporations'

shareholders. And because all shares of Barone's and Watkins's holding corporations were owned by tax-exempt retirement savings plans, WB Partners' seventy-percent share of the NTC Joint Venture's profits would only be subject to federal income tax if and when the retirement plans distributed benefits to their holders.

While the NTC project was ongoing, WCI sold its assets to Kuranda Capital, LP ("Kuranda"). The purchase agreement allocated a portion of the sales price as consideration for a noncompetition agreement, whereby Watkins, Barone, and WCI agreed not to compete with Kuranda in the environmental remediation business. WB Partners claimed all of the proceeds of the noncompetition agreement on its tax returns.

This action began when Appellants WB Partners, WB Acquisition, and Barone's holding corporation (collectively, "Taxpayers") challenged certain tax deficiencies identified by the Commissioner of Internal Revenue. In three consolidated decisions, the Tax Court found that the NTC Joint Venture was not a valid partnership for tax purposes, and therefore that all of the joint venture's profits were taxable income to WCI. The Tax Court determined that all of the proceeds from the noncompetition agreement were income to WCI as well. Because WCI had substantially understated its income, the Tax Court upheld the Commissioner's assessment of accuracy-related penalties. Taxpayers appealed.

For the reasons that follow, we affirm the decisions of the Tax Court.

## BACKGROUND

### I.   History of Watkins Contracting, Inc.

In the early 1980s, Barone and Watkins worked in the asbestos removal business in Hawaii. Watkins later returned home to San Diego, where he went to work for his father's asbestos removal company. The company soon expanded into other areas of environmental remediation. When Barone joined the company in the early 1990s, he and Watkins purchased it themselves, renaming it Watkins Contracting, Inc. ("WCI").

Barone was uncomfortable with the degree of personal liability involved in the environmental remediation business. In 1997, Barone and Watkins sold WCI's stock to REXX Environmental Corp. ("REXX"), another environmental remediation company, thereby relieving themselves of any personal liability on future projects. REXX in turn hired Barone and Watkins to manage WCI. Barone became WCI's CEO, and was responsible for "[t]he day-to-day business affairs, . . . anything from managing employees to handling financing to business development." Watkins "oversaw a lot of the field."

REXX soon encountered financial difficulties, and approached Barone and Watkins to gauge their interest in repurchasing WCI. Barone and Watkins entered an agreement to buy WCI's shares on June 10, 1999. The purchase closed on September 19, 2000.

## II. Birth of WB Partners

Barone wanted to structure the purchase agreement to afford "(1) [p]ersonal protection from creditors; (2) layers of liability protection to operate WCI; (3) the ability to invest both together [with Watkins] and separately, depending on the risks involved in each project; (4) . . . qualified retirement plans; and (5) avoid[ance of] probate." To accomplish these goals, Barone and Watkins stacked a number of holding companies between them and WCI to form a multi-layered liability shield.

Barone and Watkins created WB Acquisition, Inc., and arranged for the company to receive WCI's shares when the repurchase from REXX closed. They created two S corporations[1]—DJB Holding Corporation ("DJB") and GSW Holding Corporation ("GSW"). Barone and Watkins then entered employment agreements with DJB and GSW, respectively, and each corporation adopted an employee stock ownership plan[2] ("Plan"). The DJB Plan purchased all shares of DJB, and the GSW Plan purchased all shares of GSW. DJB and GSW then formed a general partnership called WB

---

[1] An "S corporation" is "a corporation that ha[s] elected to be taxed under Subchapter S of the [Internal Revenue] Code." *Gitlitz v. Comm'r*, 531 U.S. 206, 209 (2001). Like a general partnership, an S corporation does not pay income tax on its profits, but passes the profits through to its shareholders. *Id.*

[2] An "employee stock ownership plan" is "a type of pension plan that invests primarily in the stock of the company that employs the plan participants." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2463 (2014). The earnings of such a retirement plan are exempt from income tax, and participants in the plan pay tax on their benefits only when the benefits are distributed. 26 U.S.C. §§ 401(a), 402(a), 501(a); *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1104 (9th Cir. 2000).

Partners, in which each corporation owned a fifty-percent interest. Finally, WB Partners acquired all shares of WB Acquisition. All the necessary documents were executed in September 2000.[3]

According to Barone, the Plans were intended to provide qualified retirement plans, personal protection from creditors, and avoidance of probate. The holding corporations, DJB and GSW, permitted Barone and Watkins to pursue separate endeavors, while WB Partners allowed them to work together if they wished. Another consequence of the arrangement was that WB Partners' income would escape taxation until the Plans distributed benefits: WB Partners, DJB, and GSW are all "pass-through" entities, 26 U.S.C. §§ 701, 1363(a), 1366(a)–(c), and valid employee stock ownership plans are tax exempt, 26 U.S.C. §§ 401(a), 501(a), 4975(e)(7); T.D. 9081, 68 Fed. Reg. 42970, 42970 (July 21, 2003).[4]

As part of their employment agreements, Barone and Watkins agreed to render "construction management, indemnity, and financing services" exclusively for DJB and GSW, respectively. "Indemnity and financing services" include "providing personal guarantees required in order for clients of [DJB and GSW] to obtain a required performance bond." In turn, DJB and GSW agreed on September 20, 2000, to provide these services to WB Partners to the extent

---

[3] The Commissioner concedes that "WB Partners, [GSW], and [DJB] exist for Federal income tax purposes."

[4] As a general partnership, WB Partners does not pay income tax on its profits, but passes its earnings on to its partners, DJB and GSW. *See* 26 U.S.C. § 701. As noted, DJB and GSW are S corporations that pass their income on to their shareholders, the Plans, and the Plans are tax exempt. *See supra* nn.2, 3.

"necessary to manage and conduct the business of the Partnership."

The Tax Court found, and Taxpayers do not dispute, that Barone and Watkins performed the same roles for WCI after forming WB Partners as before. Watkins continued to oversee WCI's work on a "day-to-day basis." Barone continued to handle "business development" and "the financing."

In short, after the restructuring, WCI became a subsidiary of WB Acquisition, which was owned by WB Partners, which in turn was owned by the holding corporations DJB and GSW. Barone and Watkins became employees of their respective holding corporations rather than WCI, but continued to provide services to WCI according to the terms of their employment agreements. And WB Partners' structure ensured that Barone and Watkins would pay no tax on any of the partnership's income until they began to receive benefits from their respective retirement plans.

## III.     The NTC Joint Venture

In 1999 or 2000, the Corky McMillin Companies ("McMillin"), the Harper-Nielsen-Dillingham Joint Venture ("Harper"), and WCI joined forces to bid on a large redevelopment project at the San Diego Naval Training Center ("NTC"). The work would include removing various hazardous materials from nearly two hundred buildings. The City of San Diego awarded the contract to McMillin, who hired Harper as construction manager. WCI entered a subcontractor arrangement with Harper on December 1, 2000, for a lump-sum amount of $17,001,073. McMillin and Harper also required WCI to sign an indemnity agreement

and post a full performance bond, as neither entity was willing to do so itself.

Barone worried that assuming personal liability on a $17 million bond could bankrupt him and WCI. In order to isolate the proceeds of the NTC project from WCI's other work, Barone conceived the NTC Joint Venture.

## A. The Joint Venture's Structure

WCI and WB Partners executed the NTC Joint Venture Agreement on September 20, 2000, a week after WB Partners was formed and just over a month before WCI won the subcontract from Harper. Under the agreement, WCI would perform the actual remediation work and WB Partners would supply indemnity and financial guaranty services. The agreement further provided that WB Partners would receive seventy percent of the profits, and WCI would receive thirty percent.

The tax consequences of this arrangement bear mentioning. Because the joint venture agreement entitled WCI only to thirty percent of the profits, WCI would have to pay income tax only on that portion.[5] The remaining seventy percent of the profits would pass to WB Partners, whose income, as mentioned above, was not subject to taxation unless and until the Plans distributed benefits. In short, if the NTC Joint Venture were valid for tax purposes, only thirty percent of its income would be subject to tax now.

---

[5] A joint venture is considered a "partnership" for tax purposes. 26 U.S.C. § 761(a). Accordingly, the NTC Joint Venture would pay no tax on its income, but pass that income on to its members, WCI and WB Partners. *See* 26 U.S.C. § 701.

The agreement also provided that the joint venture would reimburse WCI for costs incurred in the remediation work, plus five percent. The agreement obligated the joint venture to keep books and records and to file income tax returns. It contemplated that Harper would award the subcontract to WCI, not to the joint venture, and make payments directly to WCI.

## B.  The Joint Venture's Conduct

On September 20, 2000, the same day the NTC Joint Venture was created, WCI, WB Partners, Barone's and Watkins's holding corporations, and the NTC Joint Venture executed a general indemnity agreement with the American International Group of Companies ("AIG"). The same entities entered a second indemnity agreement with Greenwich Insurance Company on January 2, 2002. Pursuant to the agreements, the NTC Joint Venture and all the entities that constituted it agreed to indemnify AIG and Greenwich against any costs incurred in executing a bond.

The Insurance Company of the State of Pennsylvania issued a performance bond on October 18, 2000, and replaced it soon after with a superseding bond. The bond named WCI as principal, the insurance company as surety, and both McMillin and Harper as obligees. The face amount was $17,001,073, the value of WCI's lump-sum subcontract with Harper.

The NTC Joint Venture obtained an employer identification number and its own bank account. The joint venture also tracked its own financing and prepared its own progress reports. As the joint venture agreement contemplated, WCI received payment from Harper directly.

Notwithstanding the terms of the agreement, the joint venture's accountant opted not to file a tax return for the venture. Instead, the accountant believed that separately reporting WCI's and WB Partners' income from the NTC project was sufficient.

As of September 30, 2002, WCI had billed Harper for $14,100,332, and incurred costs (plus five percent) of $5,822,738. This yielded a profit of $8,277,599, of which WB Partners was entitled to a seventy-percent share, or $5,794,319. In reality, a WCI invoice reflects that WCI paid WB Partners only $4,172,000, and kept for itself the remaining $1,622,319. As a result, WB Partners received only 50.4% of the profits, not 70%. Barone testified that the extra $1.6 million was a "bonus" to WCI in recognition of "a job well done."

## IV.    Sale of WCI's Assets to Kuranda Capital

WCI entered an asset purchase agreement with Kuranda Capital, LP ("Kuranda"),[6] on April 18, 2003. The parties agreed upon a purchase price for WCI's assets of $4,923,091 in cash and a $500,000 promissory note. As part of the transaction, Watkins, Barone, and WCI agreed not to compete with Kuranda in the environmental remediation business. The asset purchase agreement allocated $3.4 million of the purchase price to the noncompetition agreement. Taxpayers' accountant reported all of the noncompetition agreement's proceeds, including interest from the note, on WB Partners' tax returns.

---

[6] Kuranda later changed its name to Watkins Contracting, L.P., and finished the environmental remediation portion of the NTC project as WCI's subcontractor.

## V.  Tax Court

The Commissioner notified WB Acquisition and WB Partners of tax deficiencies for the years 2002 through 2005. Taxpayers filed petitions for adjustment.  The Tax Court held that (1) the NTC Joint Venture was not a valid partnership for tax purposes, (2) only WCI was bound by the noncompetition agreement, and the $3.4 million allocated to the agreement was income only to WCI, and (3) accuracy-related penalties applied.

## JURISDICTION

This Court has jurisdiction over Taxpayers' timely appeal under 26 U.S.C. § 7482.

## STANDARD OF REVIEW

This Court reviews the Tax Court's conclusions of law de novo and its findings of fact for clear error.  *Custom Chrome, Inc. v. Comm'r*, 217 F.3d 1117, 1121 (9th Cir. 2000). Whether a valid partnership existed for tax purposes turns on whether the parties intended in good faith to act as partners. *Comm'r v. Culbertson*, 337 U.S. 733, 741–42 (1949). Whether there was such an intent is a question of fact. *Comm'r v. Tower*, 327 U.S. 280, 287 (1946).  To which party to attribute an item of income is a mixed question of law and fact, reviewed de novo "unless the question is primarily factual."  *Sparkman v. Comm'r*, 509 F.3d 1149, 1157 (9th Cir. 2007).

Where the Tax Court imposed an accuracy-related penalty, we review de novo whether substantial authority supported the taxpayer's position.  *Little v. Comm'r*, 106 F.3d

1445, 1449 (9th Cir. 1997). Whether the taxpayer acted with reasonable cause and in good faith is a finding of fact reviewed for clear error. *See Hansen v. Comm'r*, 471 F.3d 1021, 1029–30 (9th Cir. 2006) (holding that the Tax Court did not clearly err in finding a lack of reasonable cause and good faith).

Under the clear error standard, the Tax Court's fact findings are upheld if its "account of the evidence is plausible in light of the record viewed in its entirety." *Wolf v. Comm'r*, 4 F.3d 709, 712–13 (9th Cir. 1993) (quoting *Serv. Emps. Int'l Union, AFL-CIO, CLC v. Fair Political Practices Comm'n*, 955 F.2d 1312, 1317 n.7 (9th Cir. 1992), *implied overruling recognized on other grounds by Mont. Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1091 n.2 (9th Cir. 2003)).

## DISCUSSION

## I.  Income from the NTC Project Attributed to WB Partners Was in Fact Income to WCI.

Taxpayers raise two arguments in the alternative. First, they argue that the Tax Court clearly erred in finding that the NTC Joint Venture was not a valid partnership for tax purposes. Second, they argue that, even if the joint venture was not a valid partnership, WCI and WB Partners reached a bona fide agreement to compensate WB Partners for providing financial guaranties. We conclude that the Tax Court properly taxed WCI on all income from the NTC project.

**A. The NTC Joint Venture Was Not a Valid Partnership for Tax Purposes**.

For tax purposes, a "partnership" is "a syndicate, group, pool, joint venture, or other unincorporated organization" that carries on "any business, financial operation, or venture" and that is not "a corporation or a trust or estate." 26 U.S.C. §§ 761(a), 7701(a)(2). To determine whether a purported joint venture is a valid partnership, courts ascertain whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." *Culbertson*, 337 U.S. at 742. The Tax Court distilled from *Culbertson* eight factors to consider in measuring the parties' intent:

> [(1)] [t]he agreement of the parties and their conduct in executing its terms; [(2)] the contributions, if any, which each party has made to the venture; [(3)] the parties' control over income and capital and the right of each to make withdrawals; [(4)] whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; [(5)] whether business was conducted in the joint names of the parties; [(6)] whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; [(7)] whether separate books of account were

maintained for the venture; and [(8)] whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

*Luna v. Comm'r*, 42 T.C. 1067, 1077–78 (1964).

Here, the Tax Court concluded that the *Luna* factors weighed against the conclusion that the NTC Joint Venture was a valid partnership. Regarding the first factor, the court noted that the parties violated the terms of the joint venture agreement both by imposing a 50.4% profit cap on WB Partners and by failing to file a tax return. These deviations from the agreement suggested to the Tax Court that WCI and WB Partners did not intend in good faith to act as partners. Second, the court found that WB Partners contributed nothing of value to the joint venture because the performance bond was issued based not on WB Partners' financial guaranties, but on the collective net worth of WCI, WB Partners, Barone, Watkins, DJB, and GSW as related entities. The marginal value of WB Partners' guaranty suggested that WB Partners did not make a meaningful contribution to the joint venture. Third, the venture's imposition of a profit cap on WB Partners demonstrated that WB Partners exercised no control over income and capital, further suggesting that WB Partners did not act as a bona fide partner.

Fourth, the profit cap and the joint venture agreement's provision guaranteeing reimbursement of WCI's costs showed that WCI and WB Partners did not intend to share profits and losses as bona fide partners would. Concerning the eighth factor, the court found that WB Partners' concession of a large portion of the profits to which it was entitled showed that the parties did not exercise mutual

control over the enterprise. The court found the remaining factors neutral in light of the joint venture's efforts to conduct itself as a valid partnership, such as opening a separate bank account and keeping its own records.[7]

On appeal, Taxpayers take issue only with the Tax Court's finding regarding the second *Luna* factor—that WB Partners contributed nothing of value to the NTC Joint Venture. They do not dispute the Tax Court's application of the *Luna* factors in any other respect, except to assert that the court's assessment of WB Partners' contribution to the venture "infected" its analysis of the other factors.

Before the Tax Court, Taxpayers argued that WB Partners' financial guaranty was an essential contribution to the NTC Joint Venture because WCI could not have won the NTC project without it. The Tax Court disagreed. It specifically noted that WCI won the NTC bond based on "the combined net worth and financial guaranties of each of WCI, WB Partners, Barone, Watkins, DJB, and GSW," not based on WB Partners' guaranty alone. Moreover, the court reasoned that WB Partners would have supplied a guaranty even if the joint venture had never existed, by virtue of being the parent entity of WCI. Finally, the court noted that only

---

[7] The Tax Court found the fifth factor "mixed" because the NTC Joint Venture obtained and used its own employer identification number as a legitimate entity would, but WCI dealt with Harper, the construction contractor, entirely in its own name. The sixth factor was neutral because, while the joint venture did not file its own tax return, it dealt with various banks as an entity separate from WCI and WB Partners. Finally, the Tax Court found the seventh factor neutral because the joint venture maintained its own bank account, income statements, and progress reports, but did so using WCI employees and did not keep "other books of account that may normally be expected in the operation of a business."

WB Partners received compensation for its financial guaranty, while Barone, Watkins, DJB, and GSW each guaranteed the bond without receiving a share of the NTC project's profits. If WB Partners' guaranty warranted compensation to the tune of seventy percent of the profits, the Tax Court reasoned, then surely the other entities' guaranties also called for some share of the proceeds.

On appeal, Taxpayers argue that WB Partners' financial guaranty and those of its owners and their employees were in fact a valuable contribution because WCI could not otherwise have posted a performance bond. They contend that Tax Court case law supports this conclusion. In *Maxwell v. Commissioner*, 29 T.C.M. (CCH) 1356 (1970), a bridge construction corporation and its majority owner formed a joint venture to bid on a lucrative contract. *Id.* at 1358. The corporation supplied all the materials and labor, and the owner provided a personal financial guaranty to enable the corporation to post a bond. *Id.* Because the corporation's net worth was not alone sufficient to secure the bond, the Tax Court found that the owner's guaranty was a valuable contribution showing intent to form a partnership. *Id.* at 1362.

As in *Maxwell*, Taxpayers argue, WCI could not have secured the necessary $17 million bond on its own. WB Partners' guaranty, along with those of its partner holding corporations and their employees, made obtaining that bond possible. Because WB Partners' financial guaranty, as well as those of Barone, Watkins, and their holding corporations, enabled WCI to obtain a performance bond, Taxpayers argue that the Tax Court clearly erred in finding that WB Partners contributed nothing valuable to the joint venture.

We conclude that the record supports the Tax Court's finding that WB Partners contributed no value to the NTC Joint Venture. Had the joint venture never existed, WB Partners would still be obligated to offer Barone's and Watkins's guaranties because both men promised to provide financial services as necessary to support WB Partners' business. As WB Partners' wholly owned subsidiary, WCI would have been entitled to Barone's and Watkins's guaranties even if WB Partners did not promise to provide those guaranties to the joint venture.

In September of 2000, in their employment agreements with the holding corporations DJB and GSW, Barone and Watkins promised to provide guaranties to enable the corporations' clients to post performance bonds. Later that month, DJB and GSW amended WB Partners' general partnership agreement to offer Barone's and Watkins's services as "necessary to manage and conduct the business of [WB Partners]." The amendment offered Barone's and Watkins's services not only to WB Partners itself, but also to any "third parties in connection with" WB Partners' business.

WCI's environmental remediation work for the NTC redevelopment project was part of WB Partners' business because WB Partners wholly owned WB Acquisition, which in turn wholly owned WCI. Because WCI's work on the NTC project was part of WB Partners' business, the partnership agreement required Barone and Watkins to provide any financial guaranties necessary to permit WCI to obtain the bond it needed to perform the work. Accordingly, WB Partners was obligated to furnish Barone's and Watkins's guaranties independently of the joint venture agreement. WB Partners' commitment to provide guaranties to the NTC Joint Venture therefore was superfluous.

Not only did Barone's and Watkins's guaranties contribute no value to the joint venture independent of what they were already obligated to provide, but the record also belies any argument that WB Partners' own guaranty, or those of DJB and GSW, held independent value. An employee of AIG, one of the companies that executed an indemnity agreement with the NTC Joint Venture, remarked that the performance bond issued because WCI, Barone, and Watkins were "financially sound indemnitors." The employee recalled that WCI's financial condition was "very good" and that Barone and Watkins both had a "pretty high" net worth. He did not remember WB Partners' financial condition (or that of DJB and GSW) at all. Moreover, at the time WB Partners provided its guaranty, it had no other assets outside its equity in the NTC Joint Venture and WB Acquisition. This evidence supports the Tax Court's conclusion that WB Partners' guaranty contributed no additional value to the NTC Joint Venture. Only Barone's and Watkins's guaranties enhanced WCI's ability to secure a performance bond, and they were obligated to provide the guaranties purely by virtue of their employment agreements and the amended partnership agreement. *Maxwell* is therefore inapposite, as the majority shareholder in that case was not obligated to offer his personal guaranty by any contract outside of the partnership agreement. *See* 29 T.C.M. (CCH) at 1358.

Because Barone and Watkins were contractually obligated to provide any guaranties necessary to permit WCI to perform environmental remediation work, WB Partners' separate commitment to provide those guaranties to the joint venture was superfluous. The Tax Court therefore did not clearly err in concluding that WB Partners contributed nothing of value to the NTC Joint Venture. Because Taxpayers do not

challenge the Tax Court's analysis of any of the other *Luna* factors, it necessarily follows that the Tax Court did not clearly err in finding that Taxpayers did not intend to operate the NTC Joint Venture as a bona fide partnership. *See Luna*, 42 T.C. at 1077–79; *Culbertson*, 337 U.S. at 742.

### B. WCI and WB Partners Did Not Agree in Good Faith To Share Profits.

Of course, if the NTC Joint Venture was not a valid partnership for tax purposes, then WB Partners does not have a partnership interest entitling it to declare as income a share of the profits from the NTC project. Taxpayers argue in the alternative that WCI agreed in good faith to assign WB Partners a share of the profits in exchange for WB Partners' signing the indemnity agreement.

Where a taxpayer agreed to pay a portion of the profits from an enterprise in exchange for financial assistance from another, that portion of the profits is income to the entity providing the assistance, not to the taxpayer. *See Stevens Bros. & Miller-Hutchinson Co., Inc. v. Comm'r*, 24 T.C. 953, 956–57 (1955). In *Stevens Brothers*, the taxpayer, a corporation in the heavy construction business, was unable to bid on a public works project because it had insufficient capital to obtain a loan. *Id.* at 954. Another corporation agreed to loan the taxpayer the necessary additional capital in exchange for a one-half share of the profits from the project. *Id.* at 955. In accordance with the agreement, the taxpayer declared only half of the profits as income. *Id.* at 956. The Tax Court held that this was proper. *Id.* The risk of loss to the second corporation was real, the terms of the agreement were fair, and the interests of both corporations were sufficiently "adverse" to permit the conclusion that the

contract was "bona fide." *Id.* In addition, the corporations actually shared the profits at the agreed-upon fifty-percent division, further demonstrating that the agreement was genuine. *Id.*

Taxpayers argue that, as in *Stevens Brothers*, WCI and WB Partners agreed that WB Partners would receive a portion of the profits from the NTC project in exchange for providing necessary financial assistance to WCI—in this case, a financial guaranty. As in *Stevens Brothers*, WB Partners assumed substantial financial risk by agreeing to indemnify the surety on the performance bond. Also as in *Stevens Brothers*, Taxpayers assert, the parties to the joint venture agreed that WB Partners would receive a percentage share of the profits in exchange for its guaranty.

To the contrary, Taxpayers' conduct shows that WCI and WB Partners did not reach a bona fide agreement to transfer a share of the profits to WB Partners in exchange for its guaranty. According to the joint venture agreement, WB Partners was to receive seventy percent of the profits for this service. Instead, as reflected in an invoice, WCI unilaterally reduced WB Partners' share to 50.4%. It is questionable that a company dealing with WCI at arms' length would give up a nearly twenty-percent share of the profits—approximately $1.6 million—so casually. This disregard for the joint venture agreement's terms demonstrates that WCI and WB Partners did not intend in good faith to be bound by that agreement.[8] Accordingly, the Tax Court did not clearly err in

---

[8] Taxpayers argue in the alternative that they are entitled to deduct WB Partners' share "as an ordinary and necessary bond guaranty expense." *See A.A. & E.B. Jones Co. v. Comm'r*, 19 T.C.M. (CCH) 1561, 1563 (1960) (permitting the taxpayer to deduct as a business expense a share of profits

finding that WCI and WB Partners did not reach a bona fide agreement to share profits. *Cf. Stevens Bros.*, 24 T.C. at 956 (noting that the lending corporation received "payment of the agreed amounts").

The record supports the Tax Court's finding that WB Partners contributed no value to the NTC Joint Venture, and therefore that WB Partners and WCI did not act as bona fide partners. *See Luna*, 42 T.C. at 1077–79; *Culbertson*, 337 U.S. at 742. WCI's arbitrary reduction of WB Partners' share of the proceeds further supports the Tax Court's finding that the two entities did not reach a bona fide agreement to share profits. *Cf. Stevens Bros.*, 24 T.C. at 956. Accordingly, the Tax Court properly determined that all of the profits from the NTC Joint Venture were income to WCI.

## II. Proceeds from the Noncompetition Agreement Were Income to WCI Rather Than WB Partners.

The "first principle of income taxation" is "that income must be taxed to him who earns it." *Culbertson*, 337 U.S. at 739–40. When a commercial transaction includes a noncompetition agreement, the portion of the proceeds allocated to that agreement is income to the persons who promised not to compete. For example, when an agreement to sell a corporation's assets includes promises by its shareholders that they will not compete with the purchaser, the shareholders must declare as income the consideration

---

paid to shareholders who indemnified a bond surety). Because we affirm the Tax Court's conclusion that the parties did not intend in good faith to transfer a share of the profits to WB Partners in exchange for its guaranties, we must also reject the suggestion that WCI is entitled to deduct that share as a business expense.

they receive for their promises.  *See Beals' Estate v. Comm'r*, 82 F.2d 268, 270 (2d Cir. 1936) (holding that stock transferred in exchange for a taxpayer's agreement not to compete was income to the taxpayer, and not merely "ancillary" to a larger reorganization plan); *Cox v. Helvering*, 71 F.2d 987, 988 (D.C. Cir. 1934) (holding that money paid in exchange for a shareholder's agreement not to compete was income to the shareholder).   By promising not to compete with the purchaser's business, the shareholders "earn" the consideration that the purchaser offers in exchange for the promise.  *See Cox*, 71 F.2d at 988 ("If [a person] refrains from exercising his skill and ability in a particular line for a definite period, what he receives in compensation . . . is income.").

Of the roughly $5.5 million price at which Kuranda agreed to purchase WCI's assets, the Tax Court concluded that the $3.4 million portion allocated to the noncompetition agreement was income to WCI, not WB Partners.   The noncompetition clause prohibits Barone, Watkins, and WCI from engaging in "Competing Services," which are defined to include any

> (i) service that has been provided, performed or offered by or on behalf of WCI (or any predecessor of WCI) at any time on or prior to the date of this Noncompetition Agreement that involves or relates to asbestos, mold, and lead abatement in residential, commercial and government properties; (ii) service that is substantially the same as, is based upon or competes in any material respect with any service referred to in clause "(i)" of this sentence.

(alterations omitted).  To summarize, Barone, Watkins, and WCI agreed not to compete with Kuranda in providing any service related to "asbestos, mold, and lead abatement."

The Tax Court noted that WCI was the only signatory to the noncompetition agreement ever to perform "asbestos, mold, and lead abatement" services.  Moreover, it was the only entity bound by the agreement that "had the proper licenses and permits to perform the necessary construction and excavation work."  While Barone's and Watkins's services were necessary to WCI's operations, the court found that WCI was entitled to those services because both men were WCI officers.  As the only entity capable of competing with Kuranda in providing environmental remediation services, the court found, WCI was the only party truly bound by the agreement.  The Tax Court therefore concluded that WCI earned all of the proceeds.  Accordingly, it found that the interest on Kuranda's $500,000 promissory note was also income to WCI, not WB Partners.  Because the Tax Court's analysis was "primarily factual," we review its assignment of the proceeds of the noncompetition agreement to WCI for clear error.  *See Sparkman*, 509 F.3d at 1155, 1157.

As Taxpayers correctly observe, the Tax Court erred in finding that only WCI was bound by the noncompetition agreement.  Instead, the agreement also bound Barone and Watkins personally.  Contrary to the Tax Court's reasoning, Barone's and Watkins's status as WCI officers does not entitle WCI to their services because Barone and Watkins were employees of their holding corporations, DJB and GSW, not of WCI.  Further, even if they were employees of WCI, Barone and Watkins were free to terminate their relationship with WCI at any time.  Because California is an at-will employment state, WCI was not entitled to Barone and

Watkins's services in the future absent a contractual agreement to that effect. *See* Cal. Lab. Code § 2922 ("An employment, having no specified term, may be terminated at the will of either party on notice to the other."); *Guz v. Bechtel Nat'l, Inc.*, 8 P.3d 1089, 1110 (Cal. 2000) ("The mere existence of an employment relationship affords no expectation, protectible by law, that employment will continue . . . unless the parties have actually adopted such terms."). The record contains no evidence of such an agreement. Accordingly, under California law, Barone and Watkins were free to sever their ties to WCI and perform environmental remediation services for another company. The noncompetition agreement therefore bound Barone and Watkins personally not to compete with Kuranda in the environmental remediation business.

Taxpayers go on to argue that the noncompetition agreement binds Barone and Watkins alone, not WCI, and that WB Partners, not Barone and Watkins, is entitled to the proceeds of the agreement. This argument rests on two fundamental misapprehensions. First, by its plain terms, the agreement forbids "[e]ach of Seller, Watkins and Barone" from performing competing services. The agreement goes on to provide that the $3.4 million amount be "allocated as partial consideration for Seller's and the Shareholders' obligations" not to compete. The asset purchase agreement defines "Seller" as WCI, and "Shareholders" refers to Barone and Watkins. The terms of the noncompetition agreement demonstrate that Barone, Watkins, and WCI each earned a share of the $3.4 million proceeds.

Second, the proceeds of the noncompetition agreement are not income to WB Partners because the partnership, like WCI, has no future claim to Barone's and Watkins's services.

It is true that Barone and Watkins agreed to provide their services exclusively for their holding corporations, DJB and GSW. DJB and GSW, in turn, agreed to provide Barone's and Watkins's services to WB Partners. However, Barone's and Watkins's employment agreements with DJB and GSW provide that either party may terminate employment at any time with ninety days' notice to the other. Accordingly, Barone and Watkins were free to leave DJB and GSW and go off to perform environmental services for another company. Because WB Partners had no right to expect Barone and Watkins to continue to provide their services into the future, Barone's and Watkins's agreement not to compete with Kuranda may not be imputed to WB Partners. WB Partners therefore earned no part of the consideration for the noncompetition agreement.

WCI, Barone, and Watkins each are individually bound not to compete with Kuranda, and therefore are each entitled to a share of the noncompetition agreement. *See Beals' Estate*, 82 F.2d at 270; *Cox*, 71 F.2d at 988. Because WB Partners has no claim to Barone's and Watkins's future services, WB Partners is entitled to no share at all. *See Culbertson*, 337 U.S. at 739–40. Accordingly, the Tax Court did not clearly err in declining to assign any portion of the proceeds of the noncompetition agreement to WB Partners.[9]

---

[9] Were the question before us, we may be inclined to hold that the Tax Court clearly erred in failing to assign any share of the noncompetition agreement's proceeds to Barone and Watkins individually. Neither party has asked that we do so.

### III.     The Tax Court Properly Assessed Accuracy-Related Penalties.

The Internal Revenue Code imposes a twenty-percent penalty on "[a]ny substantial understatement of income tax." 26 U.S.C. § 6662(b)(2), (a).    Even in the event of a substantial understatement, however, the taxpayer may escape the penalty if one or both of two conditions applies.  First, a taxpayer does not owe a penalty where the taxpayer can identify "substantial authority" supporting its treatment of an item of income.  26 U.S.C. § 6662(d)(2)(B)(i).  Second, to the extent that the taxpayer had reasonable cause for its position and acted in good faith, the penalty does not apply.  26 U.S.C. § 6664(c)(1).

The Tax Court assessed penalties against Taxpayers for substantially understating their income.  Taxpayers argue that the Tax Court's decisions in *Maxwell* and *Stevens Brothers* furnish substantial authority for their positions that the NTC Joint Venture was a valid partnership and that the parties to the venture agreed in good faith to share profits.  They also contend that they relied reasonably and in good faith on the advice of their accountant in reaching those positions.  Finally, they assert that their positions are reasonable in light of the complexity of the law governing the validity of partnerships for tax purposes.  For the reasons discussed below, we reject Taxpayers' arguments and affirm the district court's imposition of accuracy-related penalties.

### A. *Maxwell* and *Stevens Brothers* Do Not Furnish Substantial Authority for Taxpayers' Position.

"The substantial authority standard" is  somewhat less stringent than the "more likely than not standard."  Treas.

Reg. § 1.6662-4(d)(2). Substantial authority supports the taxpayer's position if, taking into account all relevant authorities, "the weight of the authorities supporting" the taxpayer's position is "substantial" when compared to the weight of authorities that are contrary to the taxpayer's position. § 1.6662-4(d)(3)(i). The weight that a court should assign to an authority "depends on its relevance and persuasiveness, and the type of document providing the authority." § 1.6662-4(d)(3)(ii). A Tax Court disposition may be relevant authority, but is "not particularly relevant" if it "is materially distinguishable on its facts." *Id.*

Taxpayers advance two Tax Court opinions as substantial authority for their position that the share of the profits from the NTC project transferred to WB Partners is properly WB Partners' income. One is *Maxwell*, in which the court found that a corporation and its majority shareholder formed a valid partnership when the shareholder agreed to guarantee a necessary bond in exchange for a share of the profits. 29 T.C.M. (CCH) at 1362. The second is *Stevens Brothers*, in which the court held that a corporation properly declared only half the profits from a project as income where it agreed to pay the other half to another corporation in exchange for a capital loan. 24 T.C. at 955–56.

*Maxwell* and *Stevens Brothers* do not amount to substantial authority because they are materially distinguishable. In each case, the taxpayer reached a bona fide agreement to share the profits from an endeavor in exchange for a financial guaranty or loan. In this case, the joint venture's decision to cap WB Partners' share at a rate apparently plucked from thin air shows that the profit-sharing agreement was not bona fide. The absence of a good-faith profit-sharing agreement distinguishes this case from

*Maxwell* and *Stevens Brothers*, and leaves Taxpayers' position unsupported by substantial authority. *See* Treas. Reg. § 1.6662-4(d)(3)(ii).

**B. Taxpayers May Not Claim Reasonable Reliance on Their Accountant's Opinion Because the Accountant Was Not Involved in Designing the NTC Joint Venture's Structure.**

Reliance on professional advice may establish reasonable cause and good faith. Treas. Reg. § 1.6664-4(b)(1). The Tax Court requires a taxpayer to prove three elements in order to show that reliance on advice was reasonable: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology Assocs., P.A. v. Comm'r*, 115 T.C. 43, 99 (2000). Once the Commissioner produces evidence showing that an accuracy-related penalty applies, the burden of proving the existence of reasonable cause and good faith falls on the taxpayer. *Higbee v. Comm'r*, 116 T.C. 438, 449 (2001); *cf. Sparkman*, 509 F.3d at 1161 (noting that the taxpayer bears the burden of overturning the Commissioner's imposition of a negligence penalty under 26 U.S.C. § 6662).

Taxpayers argued before the Tax Court that they reasonably relied on the advice of their accountant in deciding how to treat the proceeds from the NTC Joint Venture. The Tax Court noted that the accountant had not participated in any way in structuring the joint venture or any of the entities that comprised it, but merely prepared Taxpayers' tax returns based on information given him. Accordingly, the court found that Taxpayers had not supplied

the accountant with "all the necessary and accurate information," and therefore that their reliance on the accountant's tax returns was not reasonable.

Taxpayers argue that the Tax Court clearly erred in failing to specify what necessary information they neglected to provide to the accountant. They assert that the accountant was "fully aware of the NTC Joint Venture and the allocation of income between WCI and WB Partners."

The Tax Court did not clearly err. "The mere fact that a certified public accountant has prepared a tax return does not mean that he or she has opined on any or all of the items reported therein." *Neonatology Assocs.*, 115 T.C. at 100. Nothing in the record suggests that the accountant knew Barone's reasons for erecting the NTC Joint Venture, information the accountant would need in order to opine on its validity for tax purposes. *See* Treas. Reg. § 1.6664-4(c)(1)(i) (listing the taxpayer's purpose for a transaction as information the adviser must consider). More importantly, nothing in the record indicates that Taxpayers even asked the accountant for such an opinion. Instead, the record reveals only that the accountant prepared tax returns for the entities involved in the joint venture based on data supplied to him. Taxpayers have not met their burden of showing reasonable reliance on the accountant's advice. *See* Treas. Reg. § 1.6664-4(b)(1); *Higbee*, 116 T.C. at 449.

**C. Taxpayers Cannot Show That the Understatement of Income Was Due to a Reasonable Misunderstanding of Tax Law Because the Principles Governing Whether a Partnership Is Valid Are Well Settled.**

A taxpayer may show reasonable cause and good faith where the law governing its position "w[as] not settled" when the taxpayer asserted it. *See Patel v. Comm'r*, 138 T.C. 395, 417 (2012) (finding that a taxpayer reasonably claimed a deduction where the law governing the deduction's availability was in an "uncertain state"). Taxpayers argue that their position that the NTC Joint Venture was a valid partnership is reasonable because the law governing it is complex. They have missed the point of *Patel*. The law may be complex, but it is not unsettled. The *Luna* factors have been the law for fifty years. *See Luna*, 42 T.C. at 1067; *see also Bergford v. Comm'r*, 12 F.3d 166, 168–69 (9th Cir. 1993) (applying the *Luna* factors). Taxpayers offer no authority for their suggestion that the complexity of the *Luna* factors alone should excuse their failure to conduct the NTC Joint Venture as a valid partnership.

We conclude that the Tax Court did not err in upholding the Commissioner's assessment of accuracy-related penalties.

**CONCLUSION**

WB Partners offered nothing to the NTC Joint Venture that it was not already contractually obligated to provide, and WCI's arbitrary reduction of WB Partners' share of the profits demonstrated that the parties did not intend to adhere to the terms of the joint venture agreement. The Tax Court therefore did not clearly err in finding that WCI and WB

Partners did not intend to operate the joint venture as a bona fide partnership, and taxing all profits from the venture as income to WCI accordingly. *See Luna*, 42 T.C. at 1077–79; *Culbertson*, 337 U.S. at 742.

Further, though Barone and Watkins and their holding corporations agreed to supply services to WB Partners, Barone and Watkins were entitled to terminate their employment with ninety days' notice. Because Barone and Watkins could leave WB Partners and provide services to another environmental remediation company at any time, their agreement not to compete with Kuranda may not be imputed to WB Partners. The Tax Court therefore did not clearly err in assigning WB Partners no portion of the $3.4 million proceeds of the noncompetition agreement. *See Beals' Estate*, 82 F.2d at 270; *Cox*, 71 F.2d at 988; *Culbertson*, 337 U.S. at 739–40.

Finally, because Taxpayers have identified no substantial authority or reasonable cause for their positions, the Tax Court did not commit reversible error in assessing an accuracy-related penalty. *See* 26 U.S.C. §§ 6662(a), (b)(2), (d)(2)(B)(i), 6664(c)(1).

The decisions of the Tax Court are **AFFIRMED.**

# APPENDIX

