**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| VICTORIA E. DIERINGER, Deceased; EUGENE DIERINGER, Executor, *Petitioners-Appellants*, <br><br> v. <br><br> COMMISSIONER OF INTERNAL REVENUE, *Respondent-Appellee*. | No. 16-72640 <br><br> Tax Ct. No. 21992-13 <br><br> OPINION |

Appeal from a Decision of the
United States Tax Court

Argued and Submitted May 15, 2018
Portland, Oregon

Filed March 12, 2019

Before: M. Margaret McKeown and Richard A. Paez,
Circuit Judges, and Cynthia A. Bashant,* District Judge.

Opinion by Judge Paez

---

*The Honorable Cynthia A. Bashant, United States District Judge for the Southern District of California, sitting by designation.

## SUMMARY[**]

### Tax

The panel affirmed the Tax Court's decision sustaining a deficiency against an estate for overstating the amount of a charitable deduction, and sustaining an accuracy-related penalty.

Petitioner, the estate executor and heir of the decedent, declared a large charitable deduction based on the value of certain estate property at the time of death. The charity received less than the amount of the claimed deduction, and the estate received a tax windfall in the process. Petitioner contended that the Tax Court should have taken into account events that occurred after the decedent's death in determining the value of the charitable deduction.

In light of this court's holding in *Ahmanson Foundation v. United States*, which underscored "the principle that the testator may only be allowed a deduction for estate tax purposes for what is actually received by the charity," 674 F.2d 761, 772 (9th Cir. 1981), the panel affirmed the Tax Court's decision upholding the reduction of the charitable deduction and the deficiency assessment. The panel found no clear error in the Tax Court's finding that there was no evidence of a significant decline in the economy that would have decreased the value of the property being donated. The panel also found no error in the Tax Court's upholding of the accuracy-related penalty.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

W. Michael Gillette (argued), Sara Kobak, and Marc K. Sellers, Schwabe Williamson & Wyatt, P.C., Portland, Oregon, for Petitioners-Appellants.

Douglas Campbell Rennie (argued), Jennifer M. Rubin, and Joan I. Oppenheiner, Attorneys; David A. Hubbert, Acting Assistant Attorney General; Tax Division, United States Department of Justice, Washington, D.C.; for Respondent-Appellee.

## OPINION

PAEZ, Circuit Judge:

### I.

In this estate tax case, the Internal Revenue Service Commissioner ("Commissioner") assessed a deficiency against the decedent's estate for overstating the amount of a charitable contribution. The estate executor and heir declared a large charitable deduction based on the value of estate property at the time of death, only to manipulate the property for personal gain, deliver assets to the charity worth substantially less than those claimed as a deduction, and receive a tax windfall in the process. The Tax Court sustained the deficiency. We affirm in light of our holding in *Ahmanson Foundation v. United States*, where we underscored "the principle that the testator may only be allowed a deduction for estate tax purposes for what is actually received by the charity." 674 F.2d 761, 772 (9th Cir. 1981). We also affirm the Tax Court's ruling sustaining an accuracy-related penalty under I.R.C. § 6662.

**A.**

This case involves the Victoria E. Dieringer Estate ("Estate"). Victoria and her late husband Robert E. Dieringer ("Robert") had twelve children together, including Eugene Dieringer ("Eugene"), Patrick Dieringer ("Patrick"), and Timothy Dieringer ("Timothy").

The Dieringer family owns Dieringer Properties, Inc. ("DPI"), a closely held corporation that manages commercial and residential properties in Portland, Oregon, as well as a Wendy's restaurant in Texas. After Robert passed away and before Victoria's death, Eugene was the president of DPI, Patrick was the executive vice-president and secretary, Victoria was the vice-president, and Timothy was the office manager. DPI's Board of Directors ("Board") consisted of Victoria as chairperson, and Eugene, Patrick, Timothy, and Thomas Keepes ("Keepes"), who is unrelated to the Dieringers, as directors. None of the other nine Dieringer children were involved in DPI in any capacity.

Before Victoria's death, the only shareholders of DPI were Victoria, Eugene, and Patrick. Victoria owned 425 out of 525 voting shares and 7,736.5 out of 9,220.5 nonvoting shares. Eugene owned the remaining 100 voting shares, and Eugene and Patrick each owned 742 nonvoting shares.

According to Victoria's will, dated November 10, 2000, upon her death all of her Estate would pass to the Victoria Evelyn Dieringer Trust ("Trust"). The Trust, as amended on April 22, 2005, provided for Victoria's children to receive some personal effects, but no other proceeds from her estate. The Trust also provided for $600,000 in donations to various charitable organizations. Any assets remaining in the Estate would then pass to the Bob and Evelyn Dieringer Family Foundation ("Foundation"), an I.R.C. § 501(c)(3)

organization, as a charitable contribution. Under Victoria's estate plan, Eugene was appointed as the sole trustee of both the Trust and the Foundation. Patrick and Keepes served as advisory trustees of the Foundation.

Prior to Victoria's death, the DPI Board had preliminary discussions about purchasing Victoria's DPI shares as part of ongoing succession planning. A November 24, 2008 Board resolution reported that the issue had been discussed and that the Board resolved to "periodically purchase" Victoria's shares based on terms acceptable to all parties. Victoria was "completely agreeable" to such a plan. At a February 13, 2009 Board meeting, Victoria reiterated her potential interest in having DPI purchase her shares. In anticipation of entering a purchase agreement for Victoria's shares, DPI paid the Trust $45,000 prior to Victoria's death. When Victoria unexpectedly died on April 14, 2009, there were no specific redemption agreements in place.[1]

When Victoria died, Eugene was appointed executor of the Estate. To determine the value of Victoria's DPI shares for Estate administration purposes, the Estate's law firm requested that Lewis Olds & Associates perform an independent appraisal of the net asset value of DPI. The appraisal determined that the value of DPI as of the date of

---

[1] In addition to the Board resolutions that reflect conversations about redemption of Victoria's stock in 2008 and 2009, the record reflects that as early as 2000 Victoria and Robert contemplated a buy/sell agreement that would require DPI or Eugene to purchase all of Victoria or Robert's shares upon the later death of the two of them.

Victoria's death was $17,777,626 and that Victoria's shares in DPI were worth $14,182,471.**[2]**

Effective November 20, 2009, DPI's Board converted the corporate structure from a C corporation to an S corporation on the advice of Keepes. The DPI Board made this change in corporate structure to accomplish its long-term tax planning goals and to avoid certain adverse tax consequences under I.R.C. § 1374. As a result of electing S corporation status, the DPI Board decided that it should also redeem Victoria's DPI shares that were to pass to the Foundation.**[3]**

The Board entered into an agreement with the Trust to redeem Victoria's shares, prior to the shares "pouring over" into the Foundation. Initially, DPI agreed to redeem all of Victoria's shares for $6,071,558, effective November 30, 2009. This amount was based on a 2002 appraisal, since the date-of-death appraisal had not yet been completed. As a result, the redemption agreement provided that the stated price would be "reconciled and adjusted retroactively" to reflect the fair market value of the shares as of November 30, 2009. DPI executed two promissory notes payable to the

---

**[2]** Victoria's voting shares had a market value of $1,824.19 per share and her nonvoting shares had a market value of $1,732.97 per share.

**[3]** The DPI Board put forth a number of business rationales for the decision to redeem the Trust's DPI shares. These included concerns about the tax consequences of the Foundation owning shares in an S corporation, that the DPI shares did not provide enough liquidity for the Foundation to distribute five percent of its funds annually as required by I.R.C. § 4942, and that freezing the value of the Foundation's DPI shares into a promissory note could prevent future decline in the value of DPI shares given the poor economic climate. The Tax Court did not question any of these rationales.

Trust in exchange for the DPI shares.[4]  Eugene, Patrick, and Timothy entered into separate subscription agreements to purchase additional DPI shares, in order to provide funding for DPI to meet the required payments on the promissory notes.[5]  At the later Tax Court trial, the court found that there were appropriate business purposes for these subscription agreements.

At the direction of DPI, Lewis Olds & Associates performed another appraisal of the value of Victoria's DPI shares as of November 30, 2009, for the purpose of redemption ("redemption appraisal").  The redemption appraisal valued Victoria's DPI shares at $916 per voting share and $870 per nonvoting share.  Lewis Olds testified, and the Tax Court found, that Eugene (through his lawyer) instructed him to value Victoria's DPI shares as if they were a minority interest in DPI for the purposes of this appraisal, and that he would not have done so without these instructions.  Olds's appraisal therefore included a 15-percent discount for lack of control and a 35-percent discount for lack of marketability.  As a result, Victoria's

---

[4] One of the promissory notes was a short-term note for $2,250,000. The other was a long-term note for $3,776,558.  Each note was payable to the Trust, included interest, and was retroactively adjustable depending on the new appraisal value.

[5] These separate subscription agreements provided that voting shares would cost $779 per share and nonvoting shares would cost $742 per share, subject to a retroactive price adjustment.  Initially, the subscription agreements provided that Eugene would purchase 2,695 nonvoting shares; Patrick would purchase 86 voting shares and 2,695 nonvoting shares; and Timothy would purchase 25 voting shares and 108 nonvoting shares.  These amounts were later modified.  *See infra* fn. 7.

DPI shares were valued significantly less in the redemption appraisal than in the date-of-death appraisal.[6]

DPI determined that it could not afford to redeem all of Victoria's shares at the new valuation price. The redemption agreement was then amended, and consequently DPI redeemed all 425 voting shares and 5,600.5 nonvoting shares for a total purchase price of $5,263,462.[7] The balance on the long-term promissory note was amended to reflect the changes in the number and price of shares under the amended redemption agreement. After the redemption agreement was implemented, the distribution of DPI shares was as follows: (1) the Trust owned 2,136 nonvoting shares; (2) Eugene owned 200 voting shares and 2,932 nonvoting shares; (3) Patrick owned 65 voting shares and 893 nonvoting shares; and (4) Timothy owned 25 voting shares and 108 nonvoting shares. [8]

In January 2011, the Trust distributed the promissory notes and the remaining DPI shares to the Foundation. The

---

[6] Lewis Olds & Associates worked on producing the appraisals simultaneously; they are dated March 24, 2010, and March 25, 2010.

[7] Correspondingly, the subscription agreements also were modified. Under the modified agreements, Eugene purchased 100 voting shares and 2,190 nonvoting shares, Patrick purchased 65 voting shares and 86 nonvoting shares, and Timothy purchased 25 voting shares and 108 nonvoting shares.

[8] There are minor discrepancies between the number of shares indicated in the parties' stipulation and those indicated in the Tax Court's opinion. For instance, the number of nonvoting shares owned by Patrick differs between the parties' stipulation (893) and the Tax Court's opinion (828). We use the number of shares to which the parties stipulated, but the analysis is the same regardless.

state probate court approved the redemption agreement and indicated that the redemption agreement and promissory notes would not be prohibited self-dealing under I.R.C. § 4941.[9] For the 2011 tax year, the Foundation reported the following contributions on its Form 990-PF, Return of Private Foundation: (1) a noncash contribution of DPI shares with a fair market value of $1,858,961; (2) a long-term note receivable with a fair market value of $2,921,312; and (3) a short-term note receivable with a fair market value of $2,250,000. The Trust reported a capital loss of $385,934 for the sale of the 425 voting shares and $4,831,439 for the sale of 5,600.5 nonvoting shares for the taxable year ending in December 31, 2009, on its Form 1041 Tax Return. The Estate filed its Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return on July 12, 2010, reporting no estate tax liability. The Estate claimed a charitable contribution deduction of $18,812,181, based on the date-of-death value of Victoria's DPI shares.

## B.

In June 2013, the Commissioner issued a notice of deficiency to the Estate based on its July 2010 tax return (Form 706). The notice stated that there was a deficiency of $4,124,717 and imposed an accuracy-related penalty of $824,943 under I.R.C. § 6662 for error and negligence in using the date-of-death appraisal as the value of the charitable contribution of Victoria's DPI shares.

Upon receiving the notice of deficiency, the Estate filed a timely petition in the Tax Court challenging the

---

[9] I.R.C. § 4941 allows the Commissioner to impose a tax on certain transactions between a private foundation and a "disqualified person" as defined by I.R.C. § 4946(a)(1).

Commissioner's deficiency notice and penalty assessment. The Estate argued that it correctly used the date-of-death appraisal to determine the value of Victoria's DPI shares for the purpose of the charitable contribution deduction. The Commissioner responded that post-death events should be considered in determining the value of the charitable contribution, as the actions by Eugene, Patrick, and Timothy reduced the value of Victoria's contribution to the Foundation.

Following trial, the Tax Court issued a decision upholding the Commissioner's reduction of the Estate's charitable deduction and the deficiency assessment. The Tax Court found that the redemption was not part of Victoria's estate plan and there were valid business reasons for many of the transactions that took place after her death. The Tax Court also concluded, however, that post-death events—primarily Eugene's decision to apply a minority interest discount to the redemption value of Victoria's DPI shares—reduced the value of the contribution to the Foundation and therefore reduced the value of the Estate's charitable deduction. But the evidence did not support the conclusion that a poor business climate caused the reported decline in share values, as the Estate argued. Further, the Tax Court affirmed the Commissioner's determination that the Estate was liable for a penalty under I.R.C. § 6662(a). After denying the Estate's motion for reconsideration, the Tax Court entered a final decision in favor of the Commissioner, which sustained an estate tax deficiency of $4,124,717 and an accuracy-related penalty of $824,943. The Estate timely appealed.

## II.

We review de novo the Tax Court's legal conclusions, *see DJB Holding Corp. v. Comm'r*, 803 F.3d 1014, 1022 (9th

Cir. 2015), as well as the Tax Court's interpretation of the Internal Revenue Code, *see Metro One Telecomms., Inc. v. Comm'r*, 704 F.3d 1057, 1059 (9th Cir. 2012). We review for clear error the Tax Court's factual findings. *See DJB Holding Corp.*, 803 F.3d at 1022. Under clear error review, if the Tax Court's interpretation of the evidence is plausible, we must uphold it. *See Leslie v. Comm'r*, 146 F.3d 643, 646 (9th Cir. 1998).

Where the Tax Court sustains an accuracy-related penalty, we review for clear error the Tax Court's finding of negligence. *Hansen v. Comm'r*, 471 F.3d 1021, 1028 (9th Cir. 2006). We review de novo whether substantial authority supported the taxpayer's position, but we review for clear error whether the taxpayer acted with reasonable cause and in good faith. *DJB Holding Corp.*, 803 F.3d at 1022.

## III.

The Estate challenges the Tax Court's final decision on three grounds. First, it argues that the Tax Court erred by taking into account events that occurred after Victoria's death in determining the value of the charitable deduction. Instead, the Estate argues that the charitable deduction should have been valued as of Victoria's date of death. Second, the Estate argues that even if post-death events could be considered, the Tax Court erred by not accounting for a decline in value of Victoria's shares caused by economic forces. Third, the Estate argues that the Tax Court erred by upholding the accuracy-related penalty under I.R.C. § 6662. We reject all three arguments.

## A.

At the center of the parties' dispute is whether the Estate's charitable deduction should be valued at the time of

Victoria's death, or whether the post-death events that decreased value of the property delivered to charity should be considered.

### The Estate Tax and Charitable Deductions

It is well established that the "estate tax is a tax on the privilege of transfer[r]ing property" after one's death. *Propstra v. United States*, 680 F.2d 1248, 1250 (9th Cir. 1982). The estate tax "is on the act of the testator not on the receipt of the property by the legatees." *Estate of Simplot v. Comm'r*, 249 F.3d 1191, 1194 (9th Cir. 2001) (citing *Ithaca Tr. Co. v. United States*, 279 U.S. 151, 155 (1929)).

Because the estate tax is a tax on the decedent's bequest of property, the valuation of the gross estate is typically done as of the date of death. *See* I.R.C. § 2031; *Tr. Servs. of Am., Inc. v. United States*, 885 F.2d 561, 568–69 (9th Cir. 1989). The pertinent statute provides that "[t]he value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property . . . wherever situated." I.R.C. § 2031(a); *see also id.* § 2033 (mandating that property in which the decedent had an interest be valued on the date of decedent's death); Treas. Reg. § 20.2031-1(b) (requiring the valuation of property at the "fair market value at the time of the decedent's death" unless an exception applies). Except in some limited circumstances, such as when the executor elects to use an alternative valuation under I.R.C. § 2032, post-death events are generally not considered in determining the estate's gross value for purposes of the estate tax. The parties agree that the executor did not use the alternative valuation method in this case.

A related provision allows for deductions from the value of the gross estate for transfers of assets to qualified

charitable entities.    I.R.C. § 2055(a).    This deduction generally is allowed "for the value of property included in the decedent's gross estate and transferred by the decedent . . . by will."    Treas. Reg. § 20.2055-1(a).    Congress's allowance for a charitable deduction was a "liberalization[] of the law in the taxpayer's favor."    *Helvering v. Bliss*, 293 U.S. 144, 151 (1934).    Yet, as we have recognized, deductions are acts of "legislative grace."    *Comm'r v. Shoong*, 177 F.2d 131, 132 (9th Cir. 1949).    "[T]he purpose of the charitable deduction [is] to encourage gifts to charity." *Ahmanson*, 674 F.2d at 772; *see also Underwood v. United States*, 407 F.2d 608, 610 (6th Cir. 1969) ("The purpose of allowing charitable deductions is to encourage testators to make charitable bequests, not to permit executors and beneficiaries to rewrite a will so as to achieve tax savings.").

### *Valuing the Charitable Deduction*

Deductions are valued separately from the valuation of the gross estate.    *See Ahmanson*, 674 F.2d at 772 ("The statute does not ordain equal valuation as between an item in the gross estate and the same item under the charitable deduction.").        Separate    valuations    allow    for    the consideration of post-death events, as required by *Ahmanson* and provisions of the tax code.

We addressed valuation of a charitable deduction in *Ahmanson*.    There, the decedent's estate plan provided for the voting shares in a corporation to be left to family members and the nonvoting shares to be left to a charitable foundation.    *Id.* at 765–66.    We held that when valuing the charitable deduction for the nonvoting shares, a discount should be applied to account for the fact that the shares donated to charity had been stripped of their voting power. *Id.* at 772.    That a discount was not applied to the value of the nonvoting shares in the gross estate did not impact our

holding. *Id.* Importantly, we recognized that a charitable deduction "is subject to the principle that the testator may only be allowed a deduction for estate tax purposes for what is actually received by the charity." *Id.*

In contrast, the Estate argues the charitable deduction must be valued as of the date of Victoria's death, in keeping with the date-of-death valuation of an estate. We disagree. Although the Supreme Court and our court have applied that valuation method where the remainder of an estate is donated to charity after a post-death contingency, there is no uniform rule for all circumstances. *Ithaca Trust*, 279 U.S. at 154; *Wells Fargo Bank & Union Tr. Co. v. Comm'r*, 145 F.2d 132 (9th Cir. 1944). In *Ithaca Trust*, the decedent left the remainder of his estate to his wife for her life, with any assets remaining after her death to be donated to charity. 279 U.S. at 154. The decedent's wife unexpectedly died only six months after the decedent. *Id.* at 155. The Court considered whether the charitable deduction should reflect the amount actually given to charity after the wife's premature death, but ultimately determined that the deduction should instead reflect a valuation based on mortality tables for the wife on the date of the decedent's death. *Id.*

We applied *Ithaca Trust* in *Wells Fargo*, where the decedent had created a trust with instructions that the trust's income be paid to the decedent's sister from the date of the decedent's death to the date of the sister's death, and after the sister's death that the corpus of the trust be given to charity. 145 F.2d at 133. Due to commingling of assets after the decedent's death and an unrelated tax dispute, part of the corpus of the trust was used to support the decedent's sister, which reduced the amount that went to charity upon her death. *Id.* The Tax Court relied on these payments to

disallow part of the charitable deduction, but we reversed, concluding that the charitable deduction must be determined from data available at the time of death. *Id.*; *see also Estate of Van Horne v. Comm'r*, 720 F.2d 1114, 1117 (9th Cir. 1983) (relying on *Ithaca Trust* to "hold that legally enforceable claims valued by reference to an actuarial table meet the test of certainty for estate tax purposes" when valuing spousal support obligation).

Neither *Ithaca Trust* nor *Wells Fargo*, however, set in stone the date of death as the date of the valuation of assets for purposes of a deduction. *See Shedd's Estate v. Comm'r*, 320 F.2d 638, 639 (9th Cir. 1963) ("Congress did not intend to make events at the date of death invariably determinative in computing the federal estate tax obligation."). Nor could they. Certain deductions not only permit consideration of post-death events, but require them. For example, I.R.C. § 2053(a) authorizes a deduction for funeral expenses and estate administration expenses—costs that cannot accrue until after the death of the testator. Similarly, I.R.C. § 2055(c) specifies that where death taxes are payable out of a charitable bequest, any charitable deduction is limited to the value remaining in the estate after such post-death tax payment. Still another provision of the tax code, I.R.C. § 2055(d), prohibits the amount of a charitable deduction from exceeding the value of transferred property included in a gross estate—but, by negative implication, permits such a deduction to be lower than the value of donated assets at the moment of death. The Third Circuit also recognized that valuations of the gross estate and a charitable deduction are separate and may differ. *In Re Sage's Estate*, 122 F.2d 480, 484 (3d Cir. 1941) ("[W]hile a decedent's gross estate is fixed as of the date of his death, deductions claimed in determining the net estate subject to tax may not be

ascertainable or even accrue until the happening of events subsequent to death.").

Indeed, "[t]he proper administration of the charitable deduction cannot ignore such differences in the value actually received by the charity." *Ahmanson*, 674 F.2d at 772; *accord Irving Tr. Co. v. United States*, 221 F.2d 303, 306 (2d Cir. 1955); *Thompson's Estate v. Comm'r*, 123 F.2d 816, 817 (2d Cir. 1941); *In Re Sage's Estate*, 122 F.2d at 484. This rule prohibits crafting an estate plan or will so as to game the system and guarantee a charitable deduction that is larger than the amount actually given to charity. *Ahmanson*, 674 F.2d at 772.

### Applying Ahmanson's Rule

*Ahmanson* compels affirming the Tax Court's ruling here. Victoria structured her Estate so as not to donate her DPI shares directly to a charity, or even directly to the Foundation, but to the Trust. Victoria enabled Eugene to commit almost unchecked abuse of the Estate by setting him up to be executor of the Estate, trustee of the Trust, and trustee of the Foundation, in addition to his roles as president, director, and majority shareholder of DPI. As the Tax Court found, Eugene improperly directed Lewis Olds to determine the redemption value of the DPI shares by applying a minority interest valuation, when he knew a majority interest applied and the Estate had claimed a charitable deduction based upon a majority interest valuation. Through his actions, Eugene manipulated the charitable deduction so that the Foundation only received a fraction of the charitable deduction claimed by the Estate.

The Estate attempts to evade *Ahmanson* by arguing that it is limited to situations where the testamentary plan diminishes the value of the charitable property. Read in

context, *Ahmanson* is not limited to abuses in the four corners of the testamentary plan. *Id*. *Ahmanson* extends to situations where "the testator would be able to produce an artificially low valuation by manipulat[ion]," which includes the present situation. *Id*. Moreover, Victoria's testamentary plan laid the groundwork for Eugene's manipulation by concentrating power in his hands—in his roles as executor of the Estate and trustee of the Trust and Foundation—even after she knew of and assented to early discussions of the share redemption plan.

The Tax Court correctly considered the difference between the deduction and the property actually received by the charity due to Eugene's manipulation of the redemption appraisal value.[10]

### B.

The Estate argues that any consideration of post-death events also requires finding that the decline in value of DPI stock was due, at least in part, to market forces. The Tax Court, however, found that "[t]he evidence does not support a significant decline in the economy that resulted in a large decrease in value in only seven months." The Tax Court acknowledged that the adjusted net asset value of the DPI stock decreased from $17,777,626 at the date of Victoria's death to $16,159,167 at the date used for the redemption appraisal.[11] Still, the Tax Court found, "[t]he reported

---

[10] The Commissioner argues in the alternative that the events in this case fall under the exception in Treas. Reg. § 20.2055-2(b)(1). In light of our holding that *Ahmanson* compels affirmance, we need not address this argument.

[11] The Estate suggests that this change in adjusted net asset value is entirely attributable to a changed real estate market. This argument

decline in per share value was primarily due to the specific instruction to value decedent's majority interest as a minority interest with a 50% discount." We find nothing in the record—nor does the Estate point to anything in the record—that suggests the Tax Court's findings were clearly erroneous.

## C.

Finally, the Estate challenges the accuracy-related penalty that was imposed pursuant to I.R.C. § 6662(a). Section 6662(a) imposes a penalty of 20 percent of the amount of the underpayment attributable to either negligence or disregard of rules or regulations. A penalty will not be imposed if the taxpayer can show "that there was a reasonable cause [for the underpayment] and that the taxpayer acted in good faith." I.R.C. § 6664(c)(1). The Commissioner bears the initial burden of production regarding the applicability of the penalty, but once this burden is met, the taxpayer bears the burden of persuasion as to defenses to the penalty. *Id.* § 7491(c); *Higbee v. Comm'r*, 116 T.C. 438, 446–47 (2001).

The Tax Court first found that the Estate acted negligently. Section 6662(c) defines negligence as "any failure to make a reasonable attempt to comply" with the I.R.C. *See also Allen v. Comm'r*, 925 F.2d 348, 353 (9th Cir. 1991) (defining negligence as a "lack of due care or the failure to do what a reasonable and prudent person would do under similar circumstances"). The Tax Court found that the Estate was negligent because it "not only failed to inform the

---

misses the point. The Estate claimed an $18,205,476 charitable deduction largely based on the value of assets earmarked for the Foundation—but the Foundation only received assets worth $6,434,578.

appraiser that the redemption was for a majority interest, but also instructed the appraiser to value the redeemed DPI stock as a minority interest." We agree; the Tax Court did not clearly err in finding negligence.

The Tax Court next found that the Estate did not have reasonable cause and good faith for its negligent act. "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Treas. Reg. § 1.6664-4(b)(1). The most important factor "is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." *Id.* A reliance on professional advice may be used to show reasonable cause and good faith, but only if the professional advice meets certain requirements. *Id.* (instructing that "the circumstances under which the appraisal was obtained" are considered in determining whether there was reasonable cause and good faith).

The record evidence supports the Tax Court's finding that the Estate did not rely in good faith on its attorney's judgment. The redemption appraisal was inaccurate because of instructions from Eugene on behalf of the Estate. Therefore, the Estate "knew" that Eugene and his brothers were acquiring the DPI stock at a discount. Further, the appraiser's credible testimony that he was instructed to undertake a minority interest valuation, which he ordinarily would not have done in this situation, demonstrates the lack of good faith. *See id.* On these facts we find no error in the Tax Court's holding that the Commissioner properly imposed the accuracy-related penalty under I.R.C. § 6662(a).

## IV.

The Estate claimed an $18,205,476 charitable deduction based on the value of assets earmarked for the Foundation, but the Foundation received assets worth only $6,434,578. The Estate, at Eugene's direction, claimed a large charitable deduction representing that such assets would be delivered to the Foundation. Eugene then revalued and delivered assets—promissory notes and DPI shares—worth far less than the claimed charitable deduction. By doing so, the Estate—and various Dieringer family entities—ended up avoiding $4.1 million in taxes. We agree with the Tax Court's decision upholding the Commissioner's reduction of the Estate's charitable deduction and the deficiency assessment. To hold otherwise would only "invite abuse." *Ahmanson*, 674 F.2d at 768.

**AFFIRMED.**